# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>A black Apple iPhone in a black and clear case (Subject Device) currently in law enforcement custody at 4725 West Electric Ave, West Milwaukee, WI, as further described in Attachment A | Case No. 26-889M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 4/30/2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ________.

Date and time issued: 4/16/2026 @ 2:19 p.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________________________
*Executing officer's signature*

____________________________________
*Printed name and title*

**ATTACHMENT A**
**PROPERTY TO BE SEARCHED**

The property to be searched:

1. a black Apple iPhone in a black and clear case (**Subject Device**). Photos of the **Subject Device** are below in Figures 1 to 3. The **Subject Device** is currently located at the Drug Enforcement Administration (DEA) field office, located at 4725 West Electric Ave, West Milwaukee, WI**.**




Figure 1



Figure 2



Figure 3

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

1. All records on the Subject Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841, 843(b), and 846, and involving Djuan WILLIAMS and others from September 1, 2025 to the present, including:

a. lists of customers and related identifying information;

b. Photographs and videos;

c. text messages/call logs;

d. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

e. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

f. any information recording the schedule or travel of Djuan WILLIAMS;

g. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the **Subject Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a. records of Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

A black Apple iPhone in a black and clear case (Subject Device) currently in law enforcement custody at 4725 West Electric Ave, West Milwaukee, WI, as further described in Attachment A

Case No. 26-889M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), & 846 | Distribution and conspiracy to possess with the intent to distribute controlled substances, and illegal use of a communications facility in furtherance of drug trafficking. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days: ____________)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]

*Applicant's signature*

Patrick Beckman, DEA Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 4/16/2026

Nancy Joseph

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Patrick Beckman, being duly sworn, hereby dispose and state as follows:

## INTRODUCTION AND AFFIANT BACKGROUND

1. I make this affidavit in support of an application for a search warrant seeking authorization to examine one electronic device (**Subject Device**), described more fully in Attachment A and currently in law enforcement's possession, and the extraction from that device of electronically stored information, described more fully in Attachment B. Law enforcement believes such electronically stored information will constitute evidence of (i) distribution, and possession with intent to distribute, of controlled substances; (ii) use of a communication facility in furtherance of drug trafficking; and (iii) conspiracy to distribute controlled substances in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 (hereinafter "Target Offenses." )

2. I am an investigator and law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. That your affiant is currently employed as a Special Agent with the Drug Enforcement Administration (DEA), Chicago Division, Milwaukee District Office. I was hired by the DEA in October of 2016, as a Special Agent. In November of 2016, I attended a 16-week Basic Agent Training Course at the DEA Academy located in Quantico, Virginia. Upon graduation from the DEA academy in March of 2017, I was assigned to the Chicago Division, Rockford Resident Office as a Special Agent tasked with investigating violations of state and federal drug trafficking laws. I transferred to the Green Bay Resident Office in September of 2022 and the Milwaukee

District Office in 2025. Prior to my employment with the DEA, I served in the United States Marine Corps / Reserve from 2010 to 2015 and was a Trooper with the Illinois State Police from 2011 to 2016. I attended the Illinois State Police Academy located in Springfield Illinois from August of 2011 through March of 2012. Upon completion I was certified as a law enforcement officer in the State Of Illinois. My duties as a trooper included enforcement of the Illinois Compiled Statutes. This also included violations of the Illinois Controlled Substances Act. I attended Marquette University and graduated with a Bachelor of Arts degree with a major in International Affairs.

4. As part of my duties, I investigate criminal violations relating to narcotics trafficking and money laundering offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. By virtue of my employment as a Special Agent and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into illegal drug distribution conspiracies, including Title III investigations.

b. I have interviewed witnesses, confidential human sources (CHS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments).

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous

search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and wireless telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

1. My knowledge of the facts and circumstances contained within this affidavit is based on my personal investigation, as well as reports made to me by other law enforcement agencies, including agents of the Drug Enforcement Administration, local city and/or county law enforcement, information obtained from governmental institutions, information obtained from non-governmental institutions, including banking institutions located in Wisconsin and elsewhere, and various other reports obtained under order or subpoena. The statements contained in this affidavit are based either on my personal knowledge or information obtained from other law enforcement officers and witnesses. Throughout this affidavit, reference will be made to case "agents." Case agents are those federal, state, and local law enforcement officers who have directly

participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interview(s) and/or controlled buys with a confidential source (CS) whose reliability is established separately herein. This affidavit does not set forth every fact discerned throughout the investigation; rather, it contains a summary of the investigation to date and sets for the only those facts that I believe is necessary to establish the foundation for probable cause for an order authorizing the requested warrant.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that the user of the **Subject Device**, Djuan WILLIAMS, and others, have committed the TARGET OFFENSES. There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal offenses and will lead to the identification of other individuals who are engaged in the commission of said offenses.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6. The property to be searched is:

   a. Black iPhone cellular phone, in a black and clear case, unknown serial number ("the **Subject Device**"), which was recovered from the person of Djuan WILLIAMS on April 15, 2026 following his arrest in Milwaukee County, Wisconsin;

## PROBABLE CAUSE

7. In the fall of 2025, the Drug Enforcement Administration (DEA) Milwaukee District Office initiated an investigation into Antonio WESLEY-CARTER. Said investigation subsequently revealed that WESLEY-CARTER is a large-scale distributor of various

controlled substances to include cocaine, MDMA, and methamphetamine and that he employs others, including Scott WILLIAMS and Djuan WILLIAMS, to distribute drugs on his behalf.

8. Information was developed from a Confidential Source (CS) that identified WESLEY-CARTER as a kilogram quantity drug distributer in the Milwaukee, WI area. The CS relayed that WESLEY-CARTER utilized a specific number to facilitate drug transactions. The CS relayed that the CS knew this from prior drug transactions that occurred between the CS and WESLEY-CARTER prior to the CS's cooperation wherein the CS contacted WESLEY-CARTER at that number to arrange to purchase controlled substances. The CS was shown a photograph of WESLEY-CARTER and the CS identified the person in the photograph as the person from whom the CS purchased controlled substances.

9. Beginning in October of 2025, the CS made statements against the CS's penal interest. The CS has the following criminal convictions: disorderly conduct, possession of THC and drug paraphernalia. The CS has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by the CS has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the CS's cooperation. The CS has provided information that has led to the seizure of controlled substances and the arrest of individuals. The CS also participated in at least two controlled buys. Following the buys, the CS was debriefed by case agents and the CS's versions of events were later corroborated by case agents' review of covertly recorded audio of the controlled buy transactions (as well as video of the first controlled buy). The CS has charged and pending felony drug charges and is cooperating with law enforcement in hopes of receiving judicial and prosecutorial consideration. Within the context of

the information detailed and relied upon for purposes of this Affidavit, case agents believe that the CS is credible and the CS's information is reliable.

10. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which a confidential source (CS) purchases controlled substances from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When a confidential source (CS) is used, the CS is searched for contraband, weapons, and money before the operation. The CS is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the CS meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The CS is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the CS while under the direction and control of case agents are recorded. The purchased controlled substances are then weighed and field tested by case agents. To the extent that I refer to a controlled buy below, it was conducted in this manner unless otherwise noted.

**November 2025 Controlled Buy at 2743 N. 29th Street**

11. On or about November 18, 2025, the CS, at the direction of case agents, called WESLEY-CARTER's phone number in order to inquire about the purchase of cocaine. Following the phone call, the CS contacted case agents and relayed that the CS had spoken to WESLEY-CARTER and WESLEY-CARTER agreed to provide three ounces of cocaine to the CS for $2,100. Case agents verified that this call was placed to WESLEY-CARTER's phone number by reviewing the CS's telephone and confirming the number that was dialed, but it was not recorded or witnessed by case agents.

12. On or about November 19, 2025, at the direction of case agents, the CS placed another call to WESLEY-CARTER's phone number. Following the phone call, the CS relayed that the CS had talked to WESLEY-CARTER and WESLEY-CARTER was ready for the drug transaction. Case agents verified that this call was placed to WESLEY-CARTER's phone number by reviewing the CS's telephone and confirming the number that was dialed, but it was not recorded or witnessed by case agents.

13. An additional phone call was placed to WESLEY-CARTER's phone number by the CS leading up to the drug transaction to confirm that WESLEY-CARTER would be ready to sell the CS cocaine. This phone call was recorded and witnessed by case agents. Case agents verified that this call was placed to WESLEY-CARTER's phone number by reviewing the CS's telephone and confirming the number that was dialed.

14. On November 19, 2025, in the afternoon, case agents met with the CS. The CS and CS's vehicle were searched for contraband and U.S. Currency with negative results. The CS was provided with $2,250 of pre-recorded U.S. Currency as well as audio and video recording equipment. At approximately the same time, case agents established surveillance in the area of 2743 N. 29th Street in Milwaukee, Wisconsin. According to the CS, this address was previously utilized by the CS to meet with WESLEY-CARTER for drug transactions prior to the CS's cooperation with law enforcement.

15. Case agents maintained constant visual contact while the CS was enroute to 2743 N. 29th Street. Case agents observed the CS's vehicle park in front of 2743 N. 29th Street. After a short time, case agents observed the CS exit the CS's vehicle and enter 2743 N. 29th Street. After a short time, the CS exited 2743 N. 29th Street and got into the CS's vehicle and departed. Case agents maintained constant visual contact with the CS's vehicle while enroute to a

predetermined meeting location. Case agents met with the CS at the predetermined meeting location. Case agents retrieved the audio and video recording equipment. The CS turned over a clear plastic bag containing a white chunky substance (suspected cocaine) to case agents. The CS also turned over $150 of pre recorded U.S. Currency. Case agents searched the CS's vehicle and the CS for contraband with negative results.

16. The CS then provided a statement about what occurred within 2743 N. 29th Street. The CS relayed that the CS had entered 2743 N. 29th Street and met with an older black male (later identified as Scott WILLIAMS). The older black male provided the suspected cocaine to the CS and the CS provided $2,100 of pre-recorded U.S. Currency to the older black male. The CS relayed that the CS inquired as to the price of pills. The CS relayed that the older black male called an individual who the CS believed to be WESLEY-CARTER. The older black man then told the CS that the pills (ecstasy pills) were $70 a "jar" (a jar is 100 ecstasy pills). Initially, however, the older black male stated, "the blues" which I believe this to a be a reference to fentanyl pills. The CS clarified for the older black male that the CS was talking about ecstasy pills. The CS also relayed that the CS saw two plastic bags inside 2743 N. 29th Street near a window sill containing what the CS believed was cocaine.

17. The CS also relayed that upon getting into the CS's vehicle, the CS received a phone call from WESLEY-CARTER's phone number. This call was recorded. Case agents later confirmed this by viewing the call log of the CS's cell phone and observed an incoming call from WESLEY-CARTER's phone number at the approximate time that the CS was seen within the CS's vehicle. The CS relayed that the CS spoke to WESLEY-CARTER (via WESLEY-CARTER's phone number). WESLEY-CARTER clarified that the price for ecstasy pills was $650 for 1,000 pills. Based on my training and experience, I believe that this also confirms that the older

black male in the residence contacted WESLEY-CARTER to inquire about the price of the pills requested by the CS. The CS also relayed that the older black male had provided drugs to the CS in the past on behalf of WESLEY-CARTER. This was prior to the CS's cooperation with law enforcement.

18. Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the cocaine purchase and discussion regarding the pills. Case agents were able to see the older black male's face in the recording and subsequently identified him as Scott M. WILLIAMS. Case agents identified WILLIAMS as the older black male who provided the cocaine to the CS that the CS had ordered from WESLEY-CARTER.

19. Case agents field tested the suspected cocaine and it tested positive for the presumptive presence of cocaine. Case agents weighed the cocaine and it weighed approximately 90.3 grams.

**January 2026 Controlled Buy at 2511 W. Auer Avenue**

20. On or about January 26, 2026, case agents directed the CS to place a call to WESLEY-CARTER and inquire about purchasing "blues" (fentanyl pills) and "rollers" (ecstasy pills). This call was not recorded as the CS conducted the call prior to meeting with case agents. Case agents would later view the call log of the CS's device and confirm that the call had happened and confirmed that the CS was calling WESLEY-CARTER on WESLEY-CARTER's phone number. According to the CS: During the call, WESLEY-CARTER informed the CS that WESLEY-CARTER did not have any "blues," but stated to the CS that WESLEY-CARTER currently had the "rollers." After the CS spoke with WESLEY-CARTER, the CS immediately called case agents and notified them of the conversation. The CS further stated that during this

call, WESLEY-CARTER told the CS that WESLEY-CARTER would provide a new location for the CS to travel to for this purchase. During the time of the call between the CS and WESLEY-CARTER, case agents had been monitoring the GPS location being received on WESLEY-CARTER's phone number. Case agents observed that WESLEY-CARTER's phone number was currently in the area of 3858 N. 98th Street, Milwaukee, WI, which is the residence of WESLEY-CARTER.

21. On this same date, case agents then met with the CS at a predetermined location. During this meeting, the CS and CS's vehicle were searched for contraband and U.S. Currency with negative results. The CS was provided with $650 of pre-recorded U.S. Currency as well as audio and video recording equipment. Case agents also placed a GPS monitoring device inside the CS vehicle to monitor the CS vehicle's location in real time. At the direction of case agents, the CS departed the predetermined meeting location and was directly followed by case agents with a plan for the CS to travel towards 2743 N. 29th Street. Shortly after departing, the CS was directed by case agents to again call WESLEY-CARTER on WESLEY-CARTER's phone number with the purpose of obtaining a meeting location. This call was recorded, and during the call, WESLEY-CARTER informed the CS that WESLEY-CARTER would be ready to meet in approximately 20 minutes. The CS was not provided with a location at this time and continued traveling in the direction of 2743 N. 29th Street. Approximately 25 minutes after this call, the CS was again instructed to contact WESLEY-CARTER by calling WESLEY-CARTER's phone number. WESLEY-CARTER informed the CS to travel to 2511 W. Auer Avenue. This address was also sent via text message to the CS by WESLEY-CARTER from WESLEY-CARTER's phone number (as verified by case agents after reviewing the CS's device). Case agents would

later view this text message and download a copy of this message which was later placed into DEA evidence.

22. In anticipation of the controlled buy, case agents were monitoring location data for WESLEY-CARTER's phone number on January 26, 2026, and noted that WESLEY-CARTER's phone was not in the area of 2743 N. 29th Street. Therefore, case agents expected that the CS would again meet with an intermediary working with WESLEY-CARTER, as the CS did during the earlier buy on November 19, 2025.

23. Once the CS received the address information from WESLEY-CARTER, surveillance units were established in the area of 2511 W. Auer Avenue. However, out of an abundance of caution related to the surveillance consciousness of WESLEY-CARTER, case agents could not position themselves in a manner to see the front door of 2511 W. Auer Avenue. The CS was still being directly followed by case agents and was observed to turn eastbound on W. Auer Avenue from N. 27th Street. Case agents observed the GPS device placed in the CS vehicle show that the CS vehicle came to a stop directly in front of 2511 W. Auer Avenue. The location data obtained from this GPS device would later be downloaded and placed into DEA evidence. Case agents monitoring the cover audio recording device could overhear the CS exiting the CS vehicle and a short time later the CS could be heard talking to another person with a male voice. After a brief conversation, the CS could then be heard entering the CS vehicle and shutting the door. Shortly after, the GPS location data showed the CS vehicle to depart eastbound on W. Auer Ave at which time case agents observed the CS's vehicle turn southbound from W. Auer Ave onto N. 25th Street.

24. The CS vehicle was directly followed from this area by case agents back to a predetermined meeting location. The CS made no stops and interacted with no one from the

time the CS departed the area of 2511 W. Auer Avenue until the CS was at the predetermined location. Once at this location, case agents retrieved the audio and video recording equipment and the GPS device from the CS vehicle. The CS and CS's vehicle were again searched for contraband with negative results. Case agents field tested the multicolored pills and received a presumptive positive test for the presence of MDMA. The pills weighed approximately 479 grams. However, based on the overall investigation, I believe these pills are methamphetamine.

25. The CS provided a statement to case agents as to what had occurred during this purchase: The CS parked the CS vehicle directly in front of 2511 W. Auer Avenue and then walked to the front door of the residence and walked inside. Once inside, a black male with a short haircut and goatee was standing inside already and the CS did not previously know this individual. This unknown black male was on a FaceTime phone call when the CS entered the residence. The black male showed the CS the phone and the CS observed that this unknown black male was on the phone with WESLEY-CARTER. The CS provided the unknown male with the $650 and the black male handed the CS two plastic bags filled with the multicolored pills.

26. Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the pill purchase based upon what could be heard on the recording. However, the video did not capture the black male in the residence.

27. Through the investigation, case agents became aware that WESLEY-CARTER was associated with Djuan L. WILLIAMS (DOB: XX/XX/1979). Case agents showed the CS an unlabeled photo of Djuan WILLIAMS and the CS immediately identified Djuan WILLIAMS as the unknown black male that had been inside 2511 W. Auer Avenue Street who was on the Facetime call with WESLEY-CARTER and who provided the CS with the pills.

**March 2026 Controlled Drug and Firearm Purchase at 2511 W. Auer Avenue**

28. On March 2, 2026, the CS met with case agents at a predetermined location. At that time, the CS and CS vehicle were searched for drugs, money, weapons, or other contraband with none located. The CS was given $1,300 prerecorded DEA buy money for the pills and $900 of prerecorded ATF buy money for the firearm. The CS was directed to place a recorded call to WESLEY-CARTER's phone number and let WESLEY-Carter know that the CS was ready for the buy. This call was recorded and case agents observed that the call was made to WESLEY-CARTER's phone number. During the call, WESLEY-Carter told the CS to "pull up" which the CS understood to mean that WESLEY-Carter was ready for the deal. Prior to departing the predetermined location, case agents established surveillance units in the area of 2511 W. Auer Avenue, Milwaukee, WI. As surveillance was being established, the CS departed the predetermined meeting location and was directly followed by case agents to 2511 W. Auer Avenue. At no time was the CS out of view and the CS made no stops or interacted with anyone prior to arriving at 2511 W. Auer Avenue.

29. The CS vehicle was observed parking directly in front of 2511 W. Auer Avenue and the CS remained in the CS vehicle. Shortly after the CS was observed parking, case agents observed gray Volkswagen Atlas with Minnesota Plate SRJ495 traveling northbound on N. 26th Street from Auer Ave. Case agents have previously observed WESLEY-CARTER operating said vehicle. Shortly after, the Atlas was then observed traveling southbound on N. 25th Street towards Auer Ave, and the vehicle was ultimately observed to park directly behind 2511 W. Auer Avenue. Approximately five minutes after the Atlas observed parking, case agents observed Djuan WILLIAMS exit the front door of 2511 W. Auer Avenue. At that time, the CS was also observed

exiting the CS vehicle and entering the front door of 2511 W. Auer Avenue**.** A short time after the CS entered 2511 W. Auer Avenue, case agents observed through remote video surveillance, a black male subject exit the rear door of 2511 W. Auer Avenue and walk to the Atlas. The black male opened the front passenger door for a moment, appeared to retrieve something, and then walk back inside 2511 W. Auer Avenue using the rear door to the residence. Comparisons were later made by viewing the covert recording devices and case agents were able to positively identify WESLEY-Carter as the black male that had been observed parking the Atlas and retrieving the object from the vehicle.

30. The CS ultimately was observed leaving through the front door of 2511 W. Auer Avenue. Djuan WILLIAMS and WESLEY-Carter were observed leaving at approximately the same time as the CS. WILLIAMS entered a silver in color Hyundai Palisade, Wisconsin Plate AZS-2165 and WESLEY-Carter entered the Atlas and they both departed the area. Visual contact of the CS was briefly lost due to all parties leaving the residence at the same time. Visual surveillance was reestablished with the CS vehicle approximately 3 blocks from the residence. As case agents traveled southbound on N. 27th Street, the Atlas was observed traveling northbound on N. 27th and I clearly observed WESLEY-Carter to be the driver of the vehicle. I later reviewed the covert recording made by the CS of this buy and confirmed that during the brief time when the CS was out of view of case agents after departing the residence, the CS did not make any stops or interact with any other people.

31. Case agents met with the CS at a predetermined location at which time the CS provided a black plastic bag that contained approximately 20 smaller clear plastic baggies each containing approximately 100 multicolored suspected methamphetamine pills. The CS was searched at this time and no additional contraband was located, however the CS stated that the CS

had left the handgun inside the CS vehicle for case agents to retrieve. Case agents then located a Glock 45 9mm handgun with a loaded magazine and round in the chamber inside the CS vehicle. The CS vehicle was searched at this time for additional contraband with none located.

32. The CS relayed to case agents that as the CS parked the CS vehicle in front of 2511 W. Auer Avenue, the CS waited in the CS vehicle until the CS saw a black male exit the front door and indicate to the CS to come inside. The CS stated that once inside 2511 W. Auer Avenue, the CS observed "Tone" and the black male to be inside. Case agents have positively identified "Tone" as Antonio WESLEY-Carter and the black male has been previously positively identified as Djuan WILLIAMS. The CS stated that "Tone" (who I believe to be WESLEY-Carter) handed the CS the plastic bag containing the pills once the CS was inside the residence. The CS stated that they then observed that "Tone" (who I believe to be WESLEY-Carter) to be in possession of approximately 1,000 more of the same pills and he then placed these extra pills inside a cabinet near where he had been standing. The CS stated that that "Tone" (who I believe to be WESLEY-Carter) then exited the residence using the back door and was gone for a brief period of time. The CS stated that when that "Tone" (who I believe to be WESLEY-Carter) came back inside 2511 W. Auer Avenue, he had the handgun in his possession and then handed it to the CS. The CS stated that the CS had provided that "Tone" (who I believe to be WESLEY-Carter) with all $2,200 of prerecorded buy money for both the pills and the firearm and then departed 2511 W. Auer Avenue.

33. Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the pill and firearm purchase based upon what could be heard on the recording. Case agents were able to observe on the recording that Antonio WESLEY-Carter and

Djuan WILLIAMS were both inside the residence and the video matched the statements made by the CS.

34. Case agents then transported the Gock 45 and suspected methamphetamine pills back to Milwaukee DEA for processing. The pills were subjected to a field test that yielded positive results for the presence of amphetamines and the pills had a weight of approximately 997.8 grams.

**March 26, 2026—Execution of Federal Search Warrants**

35. On March 26, 2026, case agents executed federal search warrants at WESLEY-CARTER's residence (3858 N. 98th Street), 2511 W. Auer Avenue residence, and the 2743 N. 29th Street residence. WESLEY-CARTER was arrested at 3858 N. 98th Street. Djuan WILLIAMS and Scott WILLIAMS were not located.

36. The search of 2511 W. Auer Avenue revealed:

a. A plastic grocery bag containing several clear plastic baggies of multi-colored pills. This bag was located within the northeast bedroom on the floor. Within the same room, officers located mail identifiers for Wesley-Carter as well as license plates that were registered to him.

b. Approximately 294 grams of an unknown white/colorful powder found in the garage.

c. Approximately 58 grams of loose pills in the kitchen.

d. A Taurus model 63 semi-automatic handgun bearing serial number ABL178038. This firearm was located in a cabinet next to the fridge in the kitchen.

e. Numerous empty kilogram wrappers were located inside the residence. These empty wrappers were subjected to a field test and tested positive for the presence of cocaine.

f. An Anderson Manufacturing rifle bearing serial number 19277127. This firearm was located in the northwest bedroom on the floor next to the couch in a case.

37. The suspected methamphetamine pills recovered from the Auer Avenue residence weighed approximately 1638.1 grams.

38. The search of 2743 N. 29th Street revealed:

g. Multiple plastic grocery-style bags containing several clear plastic baggies of multi-colored pills. These bags were located within the master bedroom on the first floor of the residence underneath the bed. These pills were similar, though not identical to those found within the Auer Avenue residence.

h. Approximately 43 grams of an orange powdery substance was located in the second bedroom also located on the first floor of the residence and 27 grams of a white powder was located in this same bedroom. These substances will be lab tested but are suspected to be cutting agent.

39. The suspected methamphetamine pills recovered from the Auer Avenue residence weighed approximately 2261.4 grams.

40. The search of 3858 N. 98th Street revealed approximately 10 long guns and approximately 11 handguns as well as approximately $50,000 in cash (suspected drug proceeds).

**April 7, 2026, indictment of WESLEY-CARTER, Djuan WILLIAMS and Scott WILLIAMS**

41. On April 7, 2026, a Federal Grand Jury located in the Eastern District of Wisconsin returned a true bill indictment of WESLEY-CARTER, Djuan WILLIAMS and Scott WILLIAMS. They were charged with the following violations: Conspiracy to Distribute 500 grams or more of a mixture and substance containing methamphetamine (Wesley-Carter, S. Williams, and D. Williams), distribution of cocaine (Wesley-Carter and S. Williams), two counts of distribution of 500 grams or more of a mixture and substance containing methamphetamine (Wesley-Carter and D. Williams), possession with the intent to distribute 500 grams or more of a mixture and substance containing methamphetamine (Wesley-Carter, S. Williams, and D. Williams), and possession of a firearm in furtherance of a drug trafficking offense (Wesley-Carter). A Federal arrest warrant was issued for Djuan WILLIAMS and Scott WILLIAMS.

**Cellular Phone information for Djuan WILLIAMS**

42. An analysis of WESLEY-CARTER's telephone (414-336-1768) identified telephone number 312-459-9431 as a top caller of WESLEY-CARTER. Subscriber information provided by T-Mobile provided no information (blank subscriber data) and an activation date of December 15, 2024. A search of open source databases showed that 312-459-9431 is associated with Djuan WILLIAMS. Toll analysis showed that on March 26, 2026, 312-459-9431 contacted a Milwaukee Police Department (MPD) Sergeant. On April 7, 2026, case agents contacted the MPD Sergeant regarding the phone call. The MPD Sergeant confirmed that 312-459-9431 contacted him and additionally confirmed he knew that phone number to be utilized by Djuan WILLIAMS. Additionally, an analysis performed subsequent to a federally authorized search warrant showed that WESLEY-CARTER's Phone had 312-459-9431 listed at "Bro Juan".

**April 15, 2026 Arrest of Djuan WILLIAMS**

43. On April 15, 2026, Djuan WILLIAMS was arrested on his open arrest warrant tied to his federal indictment. At that time, case agents seized a black Apple iPhone in a black and clear case from his person (**Subject Device**). Photos of the **Subject Device** are below in Figures 1 to 3.




Figure 1



Figure 2



Figure 3

44. The **Subject Device** is currently located at the Drug Enforcement Administration (DEA) field office, located at 4725 West Electric Ave, West Milwaukee, WI**.** The applied-for warrant would authorize the forensic examination of the **Subject Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

45. Based on my training and experience, I know that drug traffickers commonly use cell phones (such as the **Subject Device**) to communicate with drug customers, drug sources, and other co-conspirators via call, text message, applications, and other means. I also know that it is common for said traffickers to also take and store photographs and video of drugs, firearms, drug proceeds, and other evidence on cell phones (such as the **Subject Device**) under their control. I also know that it is common for traffickers to have multiple cellular phones for different purposes (e.g., one phone used to contact a drug supplier and another for drug customers) and that the purpose of this is to compartmentalize one's operation in case of law enforcement investigation.

**TECHNICAL TERMS**

46. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

47. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at www.samsung.com, I believe that the **Subject Device** has capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48. Based on my knowledge, training, and experience, I know that electronic devices – like the **Subject Device** -- can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices. This information can sometimes be recovered with forensics tools.

49. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Device** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many

parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

51. *Manner of execution.* Because this warrant seeks only permission to examine **the Subject Device** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

52. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Device** described in Attachment A to seek the items described in Attachment B.

**ATTACHMENT A**
**PROPERTY TO BE SEARCHED**

The property to be searched:

1. a black Apple iPhone in a black and clear case (**Subject Device**). Photos of the **Subject Device** are below in Figures 1 to 3. The **Subject Device** is currently located at the Drug Enforcement Administration (DEA) field office, located at 4725 West Electric Ave, West Milwaukee, WI**.**




Figure 1



Figure 2



Figure 3

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

1. All records on the Subject Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841, 843(b), and 846, and involving Djuan WILLIAMS and others from September 1, 2025 to the present, including:

   a. lists of customers and related identifying information;

   b. Photographs and videos;

   c. text messages/call logs;

   d. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   e. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   f. any information recording the schedule or travel of Djuan WILLIAMS;

   g. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the **Subject Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

   a. records of Internet Protocol addresses used;

   b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.